UNITED STATES DISTRICT COURT  C/M
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------- X
                                                            :
HERBERT L. FORGES,                                          :
                                                            :  **MEMORANDUM**
                                Plaintiff,                  :  **DECISION AND ORDER**
                                                            :
                - against -                                 :  15-cv-6082 (BMC)
                                                            :
COMMISSIONER OF SOCIAL SECURITY,                            :
                                                            :
                                Defendant.                  :
----------------------------------------------------------- X

**COGAN,** District Judge.

1. Plaintiff seeks judicial review, pursuant to 2 U.S.C. § 405(g), of the decision of the Commissioner of Social Security that he was not disabled, and thus not entitled to disability benefits, as of February 26, 2010.

2. It is common ground that as a result of an inguinal hernia on his right side, for which he first had surgery in 1992, he has a severe impairment. The surgery was repeated in 2008 as it appears that scar tissue had pinched, trapped, or the surgery had damaged a nerve in the inguinal area. It is also agreed that plaintiff continues to have some level of chronic pain in the groin as a result of the hernia and/or the surgeries. The question is whether that level of pain renders him disabled under the graduated analytical framework in the Social Security Act regulations, or whether, as the Administrative Law Judge found, he has the residual functional capacity to perform sedentary work, as he had in his prior employment, with the proviso that he needs to avoid stairs and ramps.

3. Plaintiff's treating surgeon was Dr. Albert M. Wright, who appears to have performed both surgeries. His post-surgical report of July 11, 2008 (the day after the second surgery), provides useful background in understanding what Dr. Wright did during the surgery

(but of course sheds no light on plaintiff's recovery, which is the relevant issue). It recites that Dr. Wright found a clear herniation. He also found that the ileoinguinal nerve was trapped in scar tissue, presumably from the 1992 surgery. Dr. Wright freed the trapped nerve from the scar tissue and stitched up the opening using a mesh patch to join both sides of the hernia. Dr. Wright observed that plaintiff "tolerated the procedure well."

4. The next record from Dr. Wright is a "To Whom It May Concern" note nearly 18 months later (February 26, 2010), which simply says, "I am attending [plaintiff] … and [h]e is presently medically disabled and unable to work." There is nothing medical in the record to indicate why Dr. Wright thought that.

5. There is more information in another "To Whom It May Concern" note that Dr. Wright wrote more than two years after that (June 20, 2012). He described plaintiff as a

> 49 year old male who underwent repair of recurrent right inguinal hernia and neurolysis of the ilio-inguinal nerve on July 11, 2008. His post-operative course has been significant for recurrent right groin pains, right hip pains and often pains in the right medial and upper thigh areas. These complaints have been persistent in spite of analgesics, warm compresses, home physical therapy and self messages [sic]. Clinically the right groin, right hip and medial upper thigh have all been sensitive to touch, press or move. He has hyperaesthesia nerve syndrome which appears to be a permanent condition.
>
> He has reached maximum medical improvement.
>
> The report of the independent medical examiner dated 6/21/2011 states a 75% disability. A copy of that report is enclosed.

6. The IME report for worker's compensation that Dr. Wright referenced (and is deemed incorporated) in his note sets forth plaintiff's subjective complaints (more on that below) and diagnoses him, twice, as having "hypesthesia." That is actually the opposite of Dr. Wright's diagnosis, noted above, of "hyperaesthesia." But the use of hypesthesia in the IME report must be an error, as it refers to a lack of tactile sensation in an area of skin, while hyperaesthesia refers

2

to painful sensitivity in an area of skin, and if anything is clear from the entirety of this record, including the IME report cited by Dr. Wright, it is that plaintiff has hypersensitivity in his groin. Thus, the IME report noted that plaintiff "had two operations to repair a right inguinal hernia. The surgery was complicated by what appears to be damage to the claimant's nerves in the area of the incision causing him to have residual hypesthesia [sic]." The report also notes that plaintiff had positive right leg raising at 40 degrees due to pain, which seems to further support hyperaesthesia, not hypesthesia.

7. Dr. Wright filled out a detailed questionnaire on plaintiff's condition on October 12, 2012. He noted that he had been seeing plaintiff monthly since July of 2008. He described plaintiff's symptoms as "recurrent groin pain which radiates down to the right testicle [and] the back and the anterior/superior spine." Similarly, he described his "clinical findings" as "right groin pain radiating to the right testes, radiates to the back and anterior/superior iliac spine. He has had difficulty walking and he gets weak." His diagnosis was "status post-right groin hernia repair 1992. Nerve entrapment syndrome – right groin." He gave a "guarded" prognosis. He noted that the symptoms had been present since October, 2007. Medications consisted of Motrin, Flexeril, and Gabapentin, which did not produce any side effects.

8. In terms of functional capacity, Dr. Wright checked "yes" to the question of whether plaintiff had to lie down during the day, and "yes" to the question of whether plaintiff had pain, adding that "when he is up and about[,] the pains get worse and he feels weak and he has to lie down at least one hour," and that the pain was attributable to "nerve impairment syndrome." He found that plaintiff could continuously sit for up to two hours; stand for one hour; and walk for one hour. He further opined that in an 8-hour workday, plaintiff would have no problem lifting or carrying up to 5 lbs.; occasionally lifting or carrying from 6-10 lbs.; but

could never lift or carry anything heavier than that. He also found that plaintiff could never bend, squat, crawl, climb, or reach, nor could he engage in activities involving heights, driving, temperature changes, or exposure to airborne substances.

9. Dr. Wright concluded the questionnaire by noting that plaintiff met the requirements for a "listed" impairment (we are not told which listing, but the questionnaire recites that it is accompanied by the "relevant" listing for the enlightenment of the treating physician) because he "has reached maximum medical improvement he continues to have symptoms of pain with radiation to his testes, back and hip causing impaired ambulation." He diagnosed plaintiff has having "hyperaethesia nerve syndrome which appears to be a permanent condition."

10. Dr. Wright completed another questionnaire about nine months later, on July 17, 2013. It was prefaced by another "To Whom It May Concern" note, which "verif[ies] that I have attended [plaintiff] for right groin post hernia surgery – nerve entrapment syndrome as well as hip pains and back pains. He is presently disabled and unable to work. Do please excuse him from work until he is medically cleared."

11. The questionnaire itself yielded answers similar to the answers on Dr. Wright's first questionnaire. His "clinical findings and observations" were "Examination of the right groin shows some tenderness and sensitivity. Pains often radiate to the right side of the back and impair ambulation." He described plaintiff's symptoms as "recurrent" and "severe." He checked "yes" to the question of whether plaintiff's symptoms were "credible" and "reasonable … given the objective medical findings." He further noted that plaintiff's response to the analgesics he had been receiving was "poor." The prognosis was, again, "guarded." He opined that in an eight hour workday, plaintiff could continuously sit, stand and walk for ½ hour, and lie

4

down for 8 hours.  He further opined that plaintiff could lift and carry "frequently" up to 10 lbs., "occasionally" up to 25 lbs., and "never" more than 50 lbs.

12.     The ALJ essentially rejected Dr. Wright's conclusions, giving them "little weight" because the ALJ found his opinions to be "conclusory in nature and not supported by treatment notes," as well as "not consistent with the minimal objective findings of other examinations and the opinions of the consultative and independent examiners."   That is all the ALJ had to say about Dr. Wright.

13.     The ALJ didn't give plaintiff's subjective reporting much weight either. Plaintiff testified that the pain stays with him "around the clock."  He described it as a "tingling feeling" like hitting your "funny bone" except in his groin, going up and down his leg and into his testes. The medication he takes (a nerve analgesic) causes the pain to "ease[] up a little bit," but he can still feel it; the pain is "always throbbing," and the medication sometimes makes him nauseous and drowsy.  He feels the pain when he walks, and when he climbs stairs.  He analogized his pain to receiving a kick in the groin that doesn't go away.  He stated that while he showers every morning, he has to be very gentle in washing his groin area because it's painful to the touch.  He has difficulty urinating and defecating because any straining exacerbates the pain.  He also gets swelling at the incision site intermittently.

14.     When asked by the ALJ about his daily activities, plaintiff responded, "When I take the pills I have to lay back down and rest.  I don't do nothing all day."  He walks about five blocks to his mother's house every other day or so.  He uses a cane all of the time, even around the house. He testified that he can cook, but "my brother and son cooks [sic] for me. They do everything for me."  He gets food from them or his mother and puts it in the microwave.

5

15. He testified that Dr. Wright is going to do more surgery "in the near future." He had not yet set up his surgery at the time of his testimony because Dr. Wright advised him that he still needed more time to heal from the prior surgery.

16. The ALJ found that plaintiff's testimony about his symptoms "does not substantiate the allegations of the claimant to the degree alleged." He based that in part on the "conservative treatment" that plaintiff had received since surgery "with no evidence of any further surgery or extensive pain management treatment." The ALJ also discounted plaintiff's testimony because his physical examinations "revealed tenderness in the area but few other objective findings," and he also referenced that fact that plaintiff "was found to have no marked disability from and [sic] Worker's Compensation evaluations." The ALJ further found plaintiff's testimony internally inconsistent because plaintiff had acknowledged that "he was able to care for his personal needs, clean and do laundry twice per week, shop twice per month, and cook twice per day with some assistance." "Based on these statements," the ALJ concluded, "it would appear that the claimant is leading an active existence in spite of his allegations."

17. The ALJ preferred the opinions of two consultative physical examiners, upon which he placed "substantial" weight. Dr. Shannon Gearhart examined plaintiff in August, 2012 and Dr. Thukral examined him in October, 2013. The former is certified by the American Board of Preventive Medicine; her certification is in Public Health and General Preventive Medicine. Plaintiff's oral report to her was consistent with his testimony to the ALJ. She observed that plaintiff had a normal gait even though he had forgotten to bring his cane, and she felt that the cane was not necessary. He was limited in his ability to squat to 50% of normal. He had no difficulty dressing for the exam or getting on or off the examination table, or getting up from his chair. She noted tenderness on the right side of his abdomen. Flexion on his right hip was

impeded to 70%. She gave him a "stable" prognosis, and concluded that he had "marked" restrictions for heavy lifting and carrying and "mild" restrictions for prolonged walking, standing, sitting, as well as squatting, kneeling and climbing.

18. The examination report from 14 months later by the other consultative examiner, Dr. Vinod Thukral, who is in the same practice group as Dr. Gearhart, and is board certified in internal medicine, is very similar to Dr. Gearhart's. The only differences of note are that he gave plaintiff a "fair" prognosis, and found "no limitations" for sitting, standing, pulling or pushing, and "mild" limitations for lifting and carrying. I think it is also significant that he had plaintiff perform a straight leg raising test, which was negative.

19. The ALJ also gave "some weight" to the report of Workers' Compensation doctors, who found plaintiff partially disabled (under the distinguishable standard of disability in the Workers' Compensation Law). The first such report, by Dr. Marilee Mescon, who is board certified in internal medicine, is dated June 21, 2011. She found that plaintiff had a "marked" degree of disability, and diagnosed him as having "damage to [his] nerves in the area of the incision causing him to have residual hypesthesia" and that his condition was "permanent." Again, I think hypesthesia is the wrong word here because Dr. Mescon used it in the context of heightened sensitivity and pain. She also found a positive straight leg raising test with pain at 40 degrees.

20. The second worker's compensation review was performed by a board certified internist, Dr. David Pulver, on April 25, 2012. He found that plaintiff had a "mild partial disability," and he agreed that plaintiff had "continued pain the right groin area." He observed "tenderness to light touch in the entire lower right quadrant and medial aspect of the right thigh as well as along the right aspect of the scrotum." Significantly, the records he reviewed included

7

seven progress reports from a Dr. Donald Moore, generated between June 27, 2011 and February 13, 2012.

21. The reference to Dr. Moore is important because it appears that Dr. Moore was a treating physician on the medical side just as Dr. Wright was a treating physician on the surgical side. Yet Dr. Moore makes only a limited appearance in this record. The reference to the "seven progress reports" is mysterious because the seven progress reports are not part of the record, and yet, coming from a treating physician, they obviously have the potential to contain highly probative evidence.

22. The only direct evidence in the record from Dr. Moore is a questionnaire that the Commissioner sent him with a cover letter requesting records. He signed the questionnaire on August 8, 2013, and returned it with the cover letter, but he declined to provide an answer to that portion of the questionnaire that addressed plaintiff's functional capacity, stating instead that he had "not assessed" functionality. This is problematic because with at least seven treatment reports, Dr. Moore may be in the best position of all the doctors who evaluated plaintiff to opine on his functional capacity. In addition, Dr. Moore's questionnaire noted that Dr. Wright had indicated that plaintiff was "fit for work" as of April, 2009, but there is nothing in the record indicating that Dr. Wright had such an opinion, leaving me wondering why Dr. Moore thought that was Dr. Wright's opinion.

23. Dr. Moore is further referenced in an affidavit that plaintiff has submitted to this Court in opposition to the Commissioner's motion for judgment on the pleadings. There, plaintiff avers that "I have been seeing Dr. Albert Wright and Dr. Donald Moore regularly since 2008, and continue to do so." (Although the affidavit may be technically improper as outside of the administrative record, I will consider this averment, at least, in light of plaintiff's *pro se*

status.) That averment further highlights the issue of why there are no records from Dr. Moore in the administrative record, and establishes that Dr. Moore was a treating physician.

24. It is not as if the Commissioner made no effort to get records from Dr. Moore. She specifically requested them in the cover letter dated August 8, 2013. (The Commissioner's brief on the instant motion asserts that an earlier request was also made, but the citation to the record must be incorrect, as no such request is contained there, and I cannot find it elsewhere in the record.) However, the boilerplate request is ambiguous and may have misled Dr. Moore or his staff. It advises Dr. Moore that plaintiff is proceeding to a hearing for disability benefits, and then requests "Medical records dating from March 2010 until the present date," which Dr. Moore apparently did not supply. This may be because the request also enclosed the questionnaire, but the letter does not expressly refer to the questionnaire. Perhaps it is most useful to quote the entire letter to show why Dr. Moore may have been confused:

> A claim for disability benefits, filed by the above-named individual under the Social Security Act, is before the Office of Disability Adjudication and Review for hearing and decision.
>
> **Please provide the following information within the next ten days:**
>    **Medical records dating from March 2010 until the present date**
>
> If you are currently registered as a user of the Electronic Records Express (ERE), use the attached barcode information when submitting the requested evidence (RQID, RF, and DR fields). If you are not a registered user of ERE, fax the evidence, along with the enclosed barcode, using this fax number– (877)379-8558. Remember that the enclosed barcode must be the first page of each set of documents being faxed. Note: **If you request payment, the request should be returned to the address shown above or sent via the fax number noted below – it is different than the FECS fax number used for medical evidence.**
>
> Your assistance in furnishing this information will facilitate the adjudication of this claim and will be greatly appreciated. A medical release form is enclosed. We are authorized to pay up to $10.00, which is the same amount that the Disability Determination Service Office pays for such a report. If you require payment for the evidence, please supply us with the necessary information requested on the attached page and return this letter by mail or fax (718)330-2009

> to our office as soon as possible. If you have any questions, please contact Jaimie Hanlon at the phone number listed above.

(Emphasis in original, except note that the "$10.00" is underlined by hand). I do not understand the sentence "We are authorized to pay up to $10.00, which is the same amount that the Disability Determination Service Office pays for such a report," and Dr. Moore may not have either. "[S]uch report" may refer to the questionnaire; the language does not suggest that the provision of medical records constitutes a "report." But I could easily see Dr. Moore coming away from this letter thinking that if he breezed through the questionnaire and signed it, he had satisfied the request for medical records.

25. The fact that Dr. Moore marked the questions as to functional capacity as "not assessed" tends to confirm this. It suggests that he was looking at his historical records and did not find the assessment required by the questions, so when he wrote "not assessed," what he meant was that his medical records did not contain such an assessment. And since he completed the questionnaire, in a fashion anyway, he concluded that he did not need to send in the records. He does not appear to have interpreted the cover letter as requesting him to undertake an assessment of plaintiff's residual functional capacity; if he did so interpret it, he chose not to do it.

26. There is a potential further indication that Dr. Moore may have understood, or misunderstood, that the only request of him was to complete the questionnaire based on his medical records. The cover letter enclosing the questionnaire has the $10.00 reimbursement amount underlined by hand. This was likely done by the doctor or one of his staff. It shows that he focused on that nominal amount. Based on that focus, he might have concluded that rather than taking the time and effort to locate and copy the records in exchange for $10.00, it would be easier to just fill out the questionnaire in the cursory manner that he did.

27. Since plaintiff is proceeding *pro se* and has not demonstrated any familiarity with the law, I have undertaken to discern what points of error could reasonably be raised on this record. It seems to me there are two related issues.

28. First, there is the question of whether the ALJ afforded appropriate deference to the opinions of Drs. Wright and Moore. Under the treating physician rule, see Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008), the Commissioner must give a treating physician's opinion "controlling weight" regarding "the nature and severity of … impairments" if his opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. §416.927(c)(2). Because the treating physician's opinion is so significant, the Commissioner is required by statute to "make every reasonable effort to obtain from the individual's treating physician[s] … all medical evidence … necessary in order to properly make [a disability determination], prior to evaluating medical evidence obtained from any other source on a consultative basis." 42 U.S.C. § 423(d)(5)(B). "Every reasonable effort" is defined by the regulations as "an initial request for evidence from your medical source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received … one followup [sic] request to obtain the medical evidence necessary to make a determination." 20 C.F.R. § 404.1512(d)(1).

29. A closely related principle that is implicated in the instant case is the statutory and regulatory duty of the ALJ to fully develop the claimant's complete medical history for at least twelve months prior to the application date. See Ericksson v. Comm'r of Soc. Sec., 557 F.3d 79, 83 (2d Cir. 2009); see also 42 U.S.C. § 423(d)(5)(B) (providing that ALJ "shall develop a complete medical history of at least the preceding twelve months for any case in which a

11

determination is made that the individual is not under a disability"); 20 C.F.R. § 404.1512(d) ("Before we make a determination that you are not disabled, we will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary."). Although this duty is set forth in terms of a twelve-month period, the ALJ's obligation may go beyond that "if there [is] reason to believe that the information [is] necessary to reach a decision." DeChirico v. Callahan, 134 F.3d 1177, 1184 (2d Cir. 1998).

30. It seems clear that relying on the single-examination results of consulting physicians, as opposed to treating physicians, is a permissible but not optimal way of determining functional capacity. The cases have recognized that "a consulting physician's opinions or report should be given limited weight" because "consultative exams are often brief, are generally performed without benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day. Often, consultative reports ignore or give only passing consideration to subjective symptoms without stated reasons." Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990) (internal quotation marks omitted).

31. In the instant case, the consultants' examinations upon which the ALJ placed primary reliance suffer from at least some of these infirmities. There is no indication, for example, that Dr. Gearhart reviewed any medical records. She obtained plaintiff's medical history entirely based on his description, and the bulk of her report pertains to areas of his body as to which he has no problems. This suggests a once-over physical examination in which his post-surgical difficulties played no particular role. There are only two paragraphs that might bear on his particular impairment, containing her observations about his "General Appearance, Gait, and Station," which she found essentially normal, and his "Musculoskeletal" conditions,

which she found normal except for some reduced flexion in his right hip. She did not comment that the reduced flexion might be the result of the pain in his groin, and her broad, self-evident diagnosis of "history of right inguinal hernia, status post-repair x2," with a prognosis of "stable," did not acknowledge Dr. Wright's diagnosis that plaintiff has "hyperaesthesia nerve syndrome which appears to be a permanent condition" and "nerve entrapment syndrome."

32. This seems to me to be a significant omission, first, because there seems no doubt on this record that this is plaintiff's problem, and, second, because the whole point of a consulting examination should have been to assess the severity of this condition and the functional limitations it imposed, not to engage in meaningless observations of plaintiff's "Skin and Lymph Nodes"; "Head and Face"; "Eyes;" ""Ears, Nose, and Throat;" "Neck;" "Chest and Lungs;" and other body parts that have nothing to do with his impairment.

33. The later examination by Dr. Gearheart's practice-partner, Dr. Thurkal, suffers from the same shortcomings, and need not be addressed further. I do note, however, that Dr. Gearheart is a preventive medicine specialist and Dr. Thurkal is an internist, and while they are qualified as physicians to evaluate plaintiff's impairment, it seems that a surgeon would be better able to evaluate the specific effect of hyperaesthesiatic nerve syndrome on functional capacity.

34. The examinations of Dr. Gearheart and Dr. Thurkal might constitute substantial evidence if a better record could not be compiled despite reasonable effort. But I think more effort needs to be made. We have two treating physicians, one of whom, Dr. Wright, performed the two crucial surgeries on plaintiff and followed up with him for a substantial period thereafter, and the other one, Dr. Moore, his internist, who plaintiff apparently consults with regularly and who the record indicates generated at least seven treatment notes. More of an effort needs to be made before I can determine whether the ALJ appropriately discounted Dr. Wright's conclusions

as treating physician. These are physicians who actually put their hands on plaintiff in the most probative way on multiple occasions over a period of years. Their views are almost certainly worth more than two consultants who observed plaintiff walk a few steps and ascend and descend from an examining table.

35. Even with regard to the ALJ's assessment of Dr. Wright's opinion on the current record, I am not convinced that the ALJ gave it sufficient consideration. I understand that the ALJ was justifiably concerned with the absence of treatment notes, but all of the workers' compensation doctors agreed with Dr. Wright that plaintiff has damage to the inguinal nerve which without doubt is capable of producing the level of pain of which he complains. It is therefore not correct to say that Dr. Wright's assessment is "not consistent with the minimal objective findings of other examinations and the opinions of the consultative and independent examiners." I think Dr. Wright's opinion is not consistent with the consultative examiners, and it is consistent with the workers' compensation examiners. But considering that Dr. Wright has done the surgery and has been laying hands on plaintiff on a monthly basis since, I do not see why the ALJ preferred the consultants.

36. In any event, especially in the absence of an effort to obtain more records, it seems to me that the ALJ's perfunctory dismissal of Dr. Wright's evaluation as "conclusory" was itself conclusory. And I think in light of the likely confusion on the part of Dr. Moore as to what was being asked of him, an additional request is necessary.

37. I am therefore remanding the case for further development of the record and, upon such further development, to reevaluate the weight to be given to the opinions of plaintiff's treating physicians. Specifically, with regard to Dr. Wright, he should be requested to furnish copies of all treatment notes and other records showing consultations or examinations with

plaintiff. With regard to Dr. Moore, he should be requested to conduct a physical examination of plaintiff to the extent necessary to answer the questions on the questionnaire relating to functional capacity that he previously marked as "not assessed." The request to Dr. Moore should also make it clear that copies of all of his treatment notes and records are being requested, and it should be pointed out to him that the record before the Commissioner shows that there are at least seven such treatment notes in existence, although the Commissioner does not have copies. In addition, the request to Dr. Moore should direct his attention to his reference in the questionnaire to an opinion by Dr. Wright that plaintiff is "fit for work;" Dr. Moore should be advised that the Commissioner cannot find such a reference, and he should be requested to identify its source.

38. Finally, if any material gap in the treatment records of plaintiff remains after reasonable efforts to secure them, the ALJ should order an additional consultative examination, but this time by a general surgeon who should be specifically directed to examine plaintiff and opine on the existence and, if found, impact of plaintiff's hyperaesthesia nerve syndrome on plaintiff's functional capacity. That consultation should include a review of all of plaintiff's medical records that report upon the effects of plaintiff's surgery.

39. The Commissioner's motion for judgment on the pleadings is denied. The Clerk of Court is directed to enter judgment in favor of plaintiff, remanding this case to the Commissioner for further proceedings in accordance with this decision.

**SO ORDERED.**

_____
U.S.D.J.

Dated: Brooklyn, New York
June 2, 2016

15